# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# ST. JOSEPH DIVISION

| | |
|---|---|
| United States of America, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Criminal Action Number |
| | ) 05-06035-01-CR-SJ-NKL |
| Terry Keith Wendt, | ) |
| | ) |
| Defendant. | ) |

## Report and Recommendation

Pending before the Court is the MOTION TO SUPPRESS EVIDENCE filed November 29, 2005 (Doc. #23) by defendant Terry Keith Wendt ("Wendt"). On December 14, 2005, the undersigned held an evidentiary hearing on Wendt's motion. Wendt was present and was represented by his counsel, Ray Conrad. The government was represented at the hearing by Assistant United States Attorney Jess Michaelsen. At the evidentiary hearing, the government called three witnesses, to wit: Deputy Greg Coon, Special Agent Billy Lee Wright, and Officer Casey Ballantyne, all associated with the NITRO Task Force. Additionally, the government offered into evidence seven exhibits: the search warrant [Gov't Ex. #1], the application and affidavit in support of the warrant [Gov't Ex. #2], a consent to search form [Gov't Ex. #3], three photographs of Wendt's bedroom [Gov't Exs. 4A, 4B, and 4C], and a receipt for seized property [Gov't Ex. 5].

On the basis of all the evidence adduced at the evidentiary hearing, the undersigned submits the following:

## PROPOSED FINDINGS OF FACT

1. During the relevant time period, Officer Greg Coon ("Coon") was deputy with the Grundy County (Mo.) Sheriff's Office and was assigned to the NITRO Task Force (a joint force comprised of local, county, state and federal law enforcement officers). Tr. at 4.

2. On August 30, 2005, Coon received information from Chris Buckman ("Buckman"), a federal probation and parole officer, who had received confidential information that Wendt was in possession (within the previous thirty days) of two firearms at his residence. The confidential source also stated that Wendt was driving a brown Ford Taurus with Iowa registration, Wendt did not have a valid driver's license, and Wendt frequented a bar called the Crossroads Bar and Grill in Princeton, Missouri. Tr. at 5; Gov't Ex. 2 [Coon Affidavit].

3. On October 12, 2005, Coon received information from the Mercer County (Mo.) Sheriff's Office indicating that a confidential source (the same as the source for Buckman) had informed them that Wendt was in possession of a .22 caliber rifle located in his bedroom at his home in Princeton, Missouri. Tr. at 5; Gov't Ex. 2 [Coon Affidavit].

4. On October 13, 2005, Coon contacted the same confidential source and obtained similar information. Specifically Coon was told that Wendt had stated to the confidential source that he was in possession of a .22 caliber rifle and that the rifle was located in Wendt's bedroom. According to the source, the conversation had occurred two weeks previously. The source added that she had not actually seen the rifle for approximately two months. Tr. at 5, 6; Gov't Ex. 2 [Coon Affidavit].

5. On September 20 and 22, 2005 and, again, on October 13, 2005, NITRO Task Force investigators performed surveillance on Wendt in an effort to verify the information obtained from the confidential source. Tr. at 5; Gov't Ex. 2 [Coon Affidavit].

6. The surveillance (and a computer records search) verified some of the information provided by the confidential source, including the facts that (1) Wendt lived at an address in Princeton, Missouri, (2) Wendt spent many of his evenings at the Crossroads Bar in Princeton, (3) Wendt drove a brown Ford Taurus with Iowa license plates, (4) Wendt did not have a valid driver's license, and (5) Wendt associated with a girlfriend whose last name was McKnight. Tr. at 6, 7, 19, 20, 21; Gov't Ex. 2 [Coon Affidavit].

7. On October 13, 2005, NITRO Task Force investigators observed Wendt driving his Taurus on Highway 65 in Grundy County, Missouri. Tr. at 7, 8; Gov't Ex. 2 [Coon Affidavit].

2

8. NITRO Task Force investigators thereafter contacted the Missouri State Highway Patrol and informed them that Wendt was likely operating a motor vehicle without a valid driver's license. Tr. at 8, 18, 36, 37; Gov't Ex. 2 [Coon Affidavit].

9. Shortly thereafter, the Missouri State Highway Patrol stopped Wendt's vehicle. Tr. at 8; Gov't Ex. 2 [Coon Affidavit].

10. At the time of the traffic stop, Wendt was driving his car and he had a passenger, Kendall Shriver ("Shriver"), in the car. Tr. at 8, 9.

11. Wendt was arrested at the scene of the traffic stop for driving on a suspended driver's license and transported to the Trenton, Missouri jail. Tr. at 10, 53.

12. Prior to being taken away to the jail, Wendt was asked if he would consent to search of his premises and he refused to consent, stating that the officers would need to get a search warrant because what was in his room would cost him a lot of years. Tr. at 11, 21, 39.

13. While en route with Wendt to the jail, Coon contacted officers to request that a prosecutor and judge be located so that a search warrant could be sought for Wendt's room. Tr. at 11, 12.

14. Shriver, Wendt's passenger at the time of the traffic stop, lived at the same address as Wendt. Tr. at 8.

15. At the time of the traffic stop, Shriver was questioned by Special Agent Billy Lee Wright ("Wright"), a special agent with the Bureau of Alcohol, Tobacco, Firearms & Explosives and the coordinator of the NITRO Task Force. Tr. at 9, 32, 34-35.

16. Upon questioning, Shriver indicated to Wright that he owned the residence where Wendt lived and Wendt rented out a room in the house. Tr. at 9, 37.

17. Shriver consented to a law enforcement search of his house, with the exception that he did not consent to a search of Wendt's rented room. Tr. at 9, 38.

18. At that point several officers, including Officer Casey Ballantyne ("Ballantyne") with the NITRO Task Force, accompanied Shriver back to his house to conduct the consent search and to secure the residence while a search warrant for Wendt's room was obtained. Tr. at 40, 50, 55, 57, 58.

3

19. It is Ballantyne's practice to perform a protective sweep of a residence before conducting any house search to "get a layout of the residence" and to ascertain the presence of "people or other hazards that can harm our officers." Tr. at 56.

20. Upon arriving at Shriver's residence, Ballantyne performed a sweep of the house "opening up doors and looking in rooms, making sure that there was no one else there." Tr. at 59.

21. Prior to walking through the house, Ballantyne had been told by Shriver that there were two bedrooms – one that was locked which belonged to Shriver and another, which was unlocked, which belonged to Wendt. Tr. at 60, 61.

22. The first bedroom that Ballantyne came upon belonged to Shriver and was locked. Tr. at 61.

23. The second bedroom door was also shut, but was unlocked. Tr. at 61.

24. Ballantyne opened the bedroom door, stepped into the room a couple of feet, turned on the light in the room and "did a quick look." Tr. at 61, 62.

25. In a corner of the bedroom, Ballantyne saw a "long gun" (Ballantyne was not sure if it was BB gun or an actual firearm). Tr. at 62, 63.

26. Thereafter, Ballantyne called Wright to inform him of what he had seen. Tr. at 69.

27. In the meantime, at the jail in Trenton, Missouri, Coon and Wright advised Wendt of his *Miranda* rights and, again, asked Wendt if he would consent to a search of his room and Wendt, again, declined. Tr. at 12, 22, 41.

28. Subsequently, however, Wright received a telephone call about the protective sweep and Wendt, overhearing Wright's end of the conversation, stated to Coon that he knew what a protective sweep was and it would cost him thirty years. Tr. at 12, 30, 31, 41, 42, 43.

29. Thereafter, Wendt invoked his right counsel and his questioning was terminated. Tr. at 24.

30. Coon and Wright then proceeded to obtain a search warrant of Wendt's premises. Tr. at 12, 25, 26, 43, 47, 48.

32. The affidavit prepared by Coon in support of the warrant included all of the information obtained from the confidential source, the surveillance performed on Wendt, and Wendt's arrest for driving on a suspended license. The affidavit also

4

included the information about Shriver's partial consent to search his house, the need for a protective sweep, and Ballantyne's observation during the sweep of a "long type firearm in the corner of the Wendt bedroom." Gov't Ex. 2 [Coon Affidavit]

31. After obtaining the warrant, Coon and other officers searched Wendt's bedroom and found a rifle and ammunition. Tr. at 14-15, 26, 27, 51 Gov't Ex. 5 [property receipt].

## PROPOSED CONCLUSIONS OF LAW

The Fourth Amendment provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated. . . ." U.S. CONST. amend. IV. As made clear in the Fourth Amendment, the constitution does not forbid all searches and seizures, but only <u>unreasonable</u> searches and seizures. *Elkins v. United States*, 364 U.S. 206, 222, 80 S.Ct. 1437, 1446 (1960). Nonetheless, as the United States Supreme Court pointedly noted over one hundred years ago:

> No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law.

*Union Pacific Railroad Co. v. Botsford*, 141 U.S. 250, 251, 11 S.Ct. 1000, 1001 (1891).

In many search and seizure scenarios, the question of legal authority (as well as reasonableness) is presumptively satisfied by a judicially-issued warrant. In this case, the subject of Wendt's MOTION TO SUPPRESS – a rifle and accompanying ammunition – were obtained pursuant to search warrant. Nonetheless, Fourth Amendment concerns remain, namely, whether the probable cause for the issuance of the search warrant was unconstitutionally obtained. In his MOTION TO SUPPRESS, argues that the "protective sweep" undertaken by officers in the Shriver home was an unconstitutional warrantless search that cannot serve as the basis for

5

probable cause to issue a warrant. The government responds that the "protective sweep" was a valid measure undertaken out of concern for officer safety. The government further argues that, in any event, the search warrant is supported by probable cause even if the results of the "protective sweep" are excised from the supporting affidavit. The Court will address the latter point first.

The totality of the circumstances is considered in determining whether probable cause exists to support a search warrant, and a warrant "is proper so long as the evidence as a whole creates a reasonable probability that the search will lead to the discovery of evidence." *United States v. Smith,* 266 F.3d 902, 904 (8th Cir.2001). The sufficiency of a warrant affidavit which contains information from an unlawful search is evaluated after deleting that information. *United States v. Templeman,* 938 F.2d 122, 124-25 (8th Cir. 1991). Consequently, assuming *arguendo*, that the "protective sweep" of Wendt's bedroom was improper, the Court will consider the sufficiency of Coon's affidavit as though that information was redacted.

In evaluating the affidavit and applying the Supreme Court's totality of the circumstances test, the Court sits in the place of an issuing magistrate who is expected to "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates,* 462 U.S. 213, 230, 103 S.Ct. 2317 (1983). To that end, probable cause is a "fluid concept," and issuing magistrates are required to read affidavits with common sense and "not in a grudging, hyper technical fashion." *Walden v. Carmack,* 156 F.3d 861, 870 (8th Cir.1998).

In this case, Coon's affidavit sets forth that the same confidential source spoke with three different law enforcement officers: a federal probation and parole officer in August of 2005, the Mercer County Sheriff sometime prior to October 12, 2005, and Coon himself on October 13, 2005. All three officers apparently found the confidential source to be reliable. On each occasion, the confidential source relayed specific information about Wendt, including that:

> Wendt was driving a brown Ford Taurus with Iowa registration,
>
> Wendt did not have a valid driver's license,
>
> Wendt frequented a bar called the Crossroads Bar and Grill in Princeton, Missouri, and
>
> Wendt was keeping a .22 caliber rifle (and ammunition) in his bedroom at his residence at 1005 East Grant Street in Princeton.

With the exception of the presence of the rifle in Wendt's bedroom, all of the information was verified by law enforcement officers before any search warrant was ever sought. It is axiomatic that, to establish probable cause for a search warrant, an officer may rely on an informant's tip. When an informant has provided reliable information in the past or where his or her tip was independently corroborated, a court may deem the informant's tip sufficiently reliable to support a probable cause determination. *United States v. Leppert,* 408 F.3d 1039, 1041 (8th Cir.2005). In this case, under these circumstances, the Court concludes that the confidential source's tip about Wendt was sufficiently reliable to support probable cause.

Moreover, the Court does not find that the tip provided by the confidential informant was unreasonably stale. As the Eighth Circuit recently found:

> A time lapse between the informant's disclosure and the search warrant's execution does not necessarily make probable cause fatally stale. Courts must consider other factors, such as the type of property subject to the search and the nature of the criminal

7

> activity involved, in determining whether information is stale.
> Probable cause cannot be quantified by simply counting the
> number of days between the occurrence of the facts supplied and
> the issuance of the affidavit.

*United States v. Caswell*, 436 F.3d 894, 898 (8th Cir. 2006) (*citations omitted*).

In this case, the confidential source had heard Wendt talk about the gun in his bedroom as recently as two weeks prior to the October 13, 2005 search warrant application, and the confidential source had seen the rifle as recently as two months prior to that date. This information is indicative of both recency as well as the ongoing nature of Wendt's criminal activity – as a felon Wendt was not permitted to be in possession of any firearm pursuant to 18 U.S.C. § 922(g)(1).[1]

Because of the above conclusion, the Court need not definitively resolve the more contentious and controversial dispute between the parties regarding the proper utilization of a "protective sweep" by law enforcement officers. However, recognizing that reasonable minds may disagree about the sufficiency of the search warrant affidavit with the "protective sweep" evidence redacted and acknowledging the strong possibility of an appeal in this matter, the Court

---

[1] In Coon's Affidavit, he notes that Shriver volunteered to officers the information that:

> He [Shriver] had firearms located in his bedroom and normally
> keeps it locked when he is not at home. Shriver said that when he
> and Wendt are in the residence, that he keeps his bedroom
> unlocked and open and his firearms are unsecured in his bedroom
> in a gun rack.

Gov't Ex. #2. The government does not argue that this access to firearms violates the requirements of 18 U.S.C. § 922(g)(1), nor does the government argue that this information supports probable cause to obtain the search warrant.

concludes that it may be beneficial to briefly sketch out the respective positions of the parties on this issue.

Wendt argues that the "protective sweep" undertaken by Ballantyne of his room on October 13, 2005, was done merely in order to search Wendt's room at a time when neither Wendt nor Shriver would consent to a search of the room and that, under the guise of "officer safety," law enforcement officers made an end run around the Fourth Amendment. In contrast, the government argues that the "protective sweep" was reasonable and necessary (and appropriately limited) for officer safety. Both parties makes formidable arguments and both parties have substantial precedent supporting their positions.

In support of Wendt's position is the Supreme Court opinion originally authorizing "protective sweeps" that seems to be quite limited, at least based on a plain reading:

> [T]he Fourth Amendment permits a properly limited protective sweep in conjunction with an <u>in-home arrest</u> when the searching officer possesses a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those <u>on the arrest scene</u>.

*Maryland v. Buie*, 497 U.S. 325, 337 (1990) (*emphasis added*). Thus, *Buie* permits a "protective sweep" when two conditions are met, to wit: (1) there is an in-home arrest, and (2) the officers on the scene have "a reasonable belief based on specific and articulable facts" that there is an another individual on the premises who poses a harm to the officers. The extent to which *Buie* can and should be applied in other scenarios is an ongoing legal debate. *See*, *e.g.*, Jamie Ruf, *Expanding Protective Sweeps Within the Home*, 43 AM. CRIM. L. REV. 143 (Winter 2006); Dara Ranson, *The Fifth Circuit's Extension of Protective Sweeps*, 50 LOY. L. REV. 1055 (Winter 2004).

9

In *United States v. Waldner*, 425 F.3d 514 (8th Cir. 2005), the Eighth Circuit, in part, addressed the issue. In *Waldner*, police went to the defendant's house to serve a protection order against the defendant that had been obtained by his wife. When the officers arrived at the house, the defendant was told that he had to vacate the house and "that he could go back into the house and gather a few things, but only if they accompanied him." *Id*. at 516. While the defendant was gathering some clothes, the officers determined that a "sweep" of rooms in the vicinity was necessary. This sweep uncovered a rifle (with a silencer).

On the ensuing appeal to the Eighth Circuit challenging the "sweep" search, the court noted the two-prong test of *Buie* and concluded:

> *Buie* authorizes protective sweeps for unknown individuals in a house who may pose a threat to officers as they effectuate an arrest; *Buie* does not allow a protective sweep for weapons or contraband.

*Id*. at 517. The *Waldner* court then notes that the "sweep" was conducted "incident to service of a protective order – a non-arrest situation." *Id*. The court concluded:

> Other circuits have applied *Buie* to non-arrest situations, but only under the second prong of *Buie*, which requires a showing of a reasonable suspicion of dangerous individuals in the house. We decline the government's invitation to extend *Buie* further.

*Id*. (*citations omitted*).

Although the last-quoted sentence from *Waldner* is somewhat cryptic, it seems to be mean one of two things: Either the Eighth Circuit will not extend *Buie* to non-arrest situations, or the Eighth Circuit will extend *Buie* to non-arrest situations, but only on "a showing of a reasonable suspicion of dangerous individuals in the house." The government's "protective

10

sweep" in this case does not meet either application. As to the first, Wendt had been arrested and in custody for some time and had not even been near the house at the time of his arrest. As to the second, while the officers may have suspected Wendt had weapons in the house, there was no evidence of articulable facts suggesting there was a "dangerous individual" in the house. At best, the officers had a reasonable suspicion that there were weapons in the house; however, in *Waldner*, the court flatly stated that "*Buie* does not allow a protective sweep for weapons."

That is not to say that the government is without substantial precedent and logic on its side. This Court is not unmindful of issues of officer safety, particularly when the officers are legitimately inside a residence, known to have weapons on the premises, with rooms closed off by shut doors. The Supreme Court has explained:

> [T]he Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant.

*Payton v. New York,* 445 U.S. 573, 590, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). Taking note of the reference to exigent circumstances, the Eighth Circuit has found that a "legitimate concern for the safety" of law enforcement officers or other individuals constitutes exigent circumstances justifying warrantless entry, even into a residence. *United States v. Vance*, 53 F.3d 220, 222 (8th Cir. 1995); *United States v. Antwine,* 873 F.2d 1144, 1147 (8th Cir.1989); *see also United States v. Williams*, 633 F.2d 742, 744 (8th Cir.1980) ( "When there is a reasonable fear of harm, a warrantless entry may be justified.").[2]

---

[2] Conversely, it is not difficult to foresee how "officer safety" concerns could be abused to the point of eviscerating the protections set forth in the Fourth Amendment. In this situation, for example, in doing a "protective sweep" for other individuals in a residence, officers presumably could look anywhere that a person could be hiding including in closets and under beds. In such a case, there may not be much difference between a "protective sweep" and a

11

Perhaps recognizing the potential conflict in these Fourth Amendment analyses, on February 14, 2006, a petition for a writ of *certiorari* was filed in a case asking the Supreme Court to address the question:

> Does the Fourth Amendment permit a protective sweep where the police are in someone's home for reasons other than making an arrest?

*Alfred G. Miller v. United States*, Case No. 051024, PETITION FOR WRIT OF CERTIORARI, at I (Feb. 14, 2006).[3] According to the *Miller* pleading, a split exists in the Circuits regarding the application of *Maryland v. Buie* in non-incident-to-arrest scenarios, with the Eighth Circuit categorized as one of the Circuits that has refused to extend a permissible "protective sweep" to non-incident-to-arrest scenarios. As of the date of this REPORT AND RECOMMENDATION, the petition for writ of *certiorari* had not been ruled upon.

Accordingly, it is

RECOMMENDED that the Court, after making an independent review of the record and applicable law, enter an order DENYING Wendt's MOTION TO SUPPRESS EVIDENCE filed November 29, 2005 (Doc. #23).

Counsel are reminded that each has 10 days from the date of receipt of a copy of this report and recommendation to file and serve specific objections to the same. A failure to file and serve timely objections shall bar attack on appeal of the factual findings in this report which are accepted or adopted by the district judge except upon the ground of plain error or manifest injustice.

---

search.

[3] The underlying case is *U.S. v. Miller*, 430 F.3d 93 (2nd Cir. 2005).

        */s/ John T. Maughmer*
        **John T. Maughmer**
  **United States Magistrate Judge**